UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VALERY LATOUCHE,

                        Petitioner,

              *- against -*

SUPERINTENDENT HAROLD D. GRAHAM,
Auburn Correctional Facility,

                    Respondent.

10 Civ. 1388 (VB)(PED)

REPORT AND
RECOMMENDATION

TO:   THE HONORABLE VINCENT BRICCETTI,
       UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

Valery LaTouche ("Petitioner") seeks, by his *pro se* petition, a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. Petitioner was convicted on November 15, 2005, after a trial by jury, in Rockland County Court (Kelly, J.) of one count of murder in the second degree, two counts of attempted robbery in the first degree, two counts of attempted robbery in the second degree, one count of criminal possession of a weapon in the second degree, one count of criminal possession of a weapon in the third degree, one count of robbery in the first degree, and one count of robbery in the second degree. For these crimes, Petitioner was sentenced to an aggregate term of twenty-five years to life plus five years of post-release supervision, as well as a $270.00 penalty assessment for each conviction.

This petition is before me pursuant to an order of reference dated March 25, 2010. See Dkt. No. 6. For the reasons set forth below, I respectfully recommend that the petition be **DENIED**.

## II. BACKGROUND[1]

### A. The Crimes

On the morning of January 19, 2005, Petitioner and an accomplice, Brandon Dixon ("Dixon"), attempted to rob Maryanne Persichetti ("Persichetti") in the parking lot of the Finkelstein Library in Spring Valley, New York. Persichetti, who worked at the library, was approached by Petitioner and Dixon as she exited her car. The two men, whose faces were obscured by clothing, demanded her money and alternated pointing a pistol at her. Although Petitioner threatened to shoot Persichetti, Persichetti refused to give the men money. Petitioner and Dixon thereafter fled the scene, and Persichetti entered the library and called the police.

Later that same morning, Petitioner and Dixon robbed a cab driver, Miguel Chinchilla Ramos ("Chinchilla") behind a building located at 27 Union Road in Spring Valley, New York. Chinchilla had picked up Petitioner and Dixon, whose faces, again, were obscured, and Petitioner sat in the cab behind Chinchilla while Dixon sat in the front passenger seat. After the cab arrived at the destination requested by Petitioner and Dixon, Petitioner exited the cab, approached the driver's side window, pointed a pistol at Chinchilla's head, and demanded Chinchilla's money. Chinchilla turned over his money, and Dixon stole some items from the cab as well. Petitioner and Dixon thereafter fled the scene and split the proceeds of the robbery.

On the next day, January 20, 2005, Petitioner, Dixon, and a third accomplice, Daquan

---

[1] Unless otherwise indicated, the information within this section is taken from a review of the petition ("Pet."), Dkt. No. 2, Petitioner's amended memorandum of law ("Pet'r's Mem."), Dkt. No. 16, and Petitioner's reply memorandum of law ("Pet'r's Reply Mem."), Dkt. No. 42; Respondent's affirmation in opposition ("Ciganek Aff."), Dkt. No. 24, and memorandum of law in opposition ("Resp't's Mem."), Dkt. No. 37; Petitioner's direct appeal brief ("Pet'r's Appeal Br."), Ciganek Aff., Ex. F; and Respondent's direct appeal brief ("Resp't's Appeal Br."), id., Ex. G.

Leary ("Leary"), attempted to rob and murdered another cab driver, Wismick Pierre ("Pierre").

Pierre had picked up the three men in his cab and had driven them to 500 Funston Avenue in

Spring Valley, New York, as they directed.  Upon arrival at the destination, Petitioner, Dixon,

and Leary exited the cab.  Dixon, armed with a pistol that had been given to him by Petitioner for

use in the robbery, pointed the pistol at Pierre and demanded money.  Dixon subsequently shot

Pierre, who died later that day at a local hospital as a result of his gunshot wounds.  Following

the shooting, Petitioner, Dixon, and Leary fled to the nearby apartment of their friend, Daron

Dyke ("Dyke").[2]  When Dyke arrived home from school that afternoon, Petitioner, Dixon, and

Leary alluded to the crime that they had committed that morning and asked Dyke to hide the

pistol.  Dyke agreed and hid the pistol in a safe in his apartment.

**B.      The Police Investigation, Petitioner's Arrest, and Petitioner's Confessions**

These crimes were investigated by officers from the Spring Valley Police Department

("SVPD"), including Detective David G. Humeston ("Humeston"), then-Detective Eric Kummert

("Kummert"), Detective Robert Bookstein ("Bookstein"), and Officer John Beltempo

("Beltempo").  Canine units were used to track the perpetrators, and these units led officers to the

area of 21 Gesner Drive in Spring Valley, New York.  On January 22, 2005, Beltempo, who was

in plainclothes and posing as a cab driver, was flagged down by Petitioner and two others outside

of 21 Gesner Drive.  Petitioner, however, apparently then recognized Beltempo from previous

encounters and ran away from the officer's cab.  Beltempo, who believed that there was an

outstanding warrant for Petitioner's arrest in Clarkstown, New York, radioed to nearby police

---

[2] The Court notes that Dyke's first and last names are spelled differently in various
documents before the Court.  The Court has adopted the spelling that Dyke provided when he
testified at Petitioner's trial.  See Dkt. No. 30 (July 19, 2005 Trial Tr.) at 156.

units, and other officers in the area arrested Petitioner.  Petitioner was thereafter released when it was determined that the Clarkstown warrant was no longer valid.

On January 25, 2005, Beltempo worked again in the area of Gesner Drive.  At approximately 12:15 p.m., Beltempo observed Petitioner exit the apartment at 21 Gesner Drive. Beltempo, who knew that Petitioner did not reside in that apartment and that Petitioner was enrolled at Ramapo High School, approached Petitioner, asked whether Petitioner had permission to be in that apartment, and asked why Petitioner was not at school.  Petitioner told Beltempo that his friend lived in the apartment but was not currently home.  Petitioner then pushed Beltempo's shoulder, ran back into the apartment, and shut the door behind him. Beltempo knocked on the door for several minutes, and, in the meantime, other officers arrived on the scene.  After approximately ten minutes, Rosemarie Christophe ("Christophe"),[3] opened the door.  Beltempo identified himself, determined that Christophe lived in the apartment, and received her permission to enter.[4]  Beltempo, along with another officer, entered the apartment and tried to arrest Petitioner, but Petitioner resisted.  Eventually, Petitioner was handcuffed and placed under arrest, and he was later charged with obstructing governmental administration and resisting arrest.  Petitioner was placed in a cell at the SVPD station around 1:00 p.m.

While Petitioner was in custody, SVPD officers continued their investigation of the crimes.  Humeston interviewed Petitioner's sister, Landy LaTouche.  She told Humeston that

---

[3] The Court notes that Christophe's first name is spelled differently in various documents before the Court.  The Court has adopted the spelling that Christophe provided when she testified at Petitioner's trial.  See Dkt. No. 30 (July 25, 2005 Trial Tr.) at 243.

[4] Christophe later told police that Petitioner was a friend of her son and generally was welcome in her home, although she was not aware that he was in her home in the moments prior to his arrest.

4

Petitioner recently had shown her a news article regarding the crimes and told her that he had committed them.  She also reported that she had seen Petitioner with a small silver handgun on January 18, 2005.  Humeston and other officers also interviewed Dyke, obtained Dyke's consent to search his apartment, and recovered the pistol that Petitioner and his accomplices had used during the crimes.

Following these interviews, at around 7:45 p.m., Humeston, Bookstein, and another SVPD officer began interviewing Petitioner, who already had been in custody for several hours. Using the SVPD's standard form, Bookstein read Petitioner his rights under Miranda v. Arizona, 384 U.S. 436 (1966), asked Petitioner whether he understood those rights, and obtained Petitioner's signed waiver of those rights.  Petitioner initially denied any involvement in the crimes but, after learning that the police had obtained the pistol, provided information regarding his involvement in the attempted robbery and murder of Pierre on January 20, 2005.  Bookstein typed up a written statement memorializing Petitioner's confession and once again read Petitioner his Miranda rights.  Petitioner again signed a form indicating that he understood and waived those rights.  Petitioner then reviewed the statement that had been prepared by Bookstein, made a correction, added a few sentences, and signed the statement in the presence of Bookstein and another officer.

After Petitioner signed this statement, Kummert orally conveyed Petitioner's Miranda rights to him and questioned him about the attempted robbery of Persichetti and the robbery of Chinchilla on January 19.  Petitioner provided information regarding his involvement in these crimes as well, and Kummert typed up written statements summarizing Petitioner's confessions to those crimes.  Petitioner reviewed these typewritten statements, made and initialed some

changes, and signed the statements in the presence of Kummert and Bookstein.

Following these interviews, which concluded around 10:40 p.m., Petitioner was transported to the Rockland County District Attorney's Office and arrived there around 11 p.m. Upon arrival, Petitioner waited in the grand jury room for approximately two hours until his interview with the assistant district attorney began just before 1 a.m.[5]  After advising Petitioner of his Miranda rights, the assistant district attorney took videotaped statements from Petitioner regarding his involvement in the crimes.  Petitioner thereafter was transported back to the SVPD station at approximately 2 a.m. and remained there until his arraignment late the following morning.

**C.**       **The Indictment**

The Rockland County Grand Jury returned an indictment charging Petitioner with one count of murder in the second degree, for the murder of Pierre, in violation of New York Penal Law § 125.25(3);[6] one count of attempted robbery in the first degree, for the attempted robbery of Pierre, in violation of New York Penal Law §§ 110.00 and 160.15(2);[7] one count of attempted robbery in the second degree, for the attempted robbery of Pierre, in violation of New York Penal

---

[5] Dixon was arrested on the same day and was being interviewed by the assistant district attorney while Petitioner waited.  See Dkt. No. 32 (July 26, 2005 Trial Tr.) at 517.

[6] "A person is guilty of murder in the second degree when . . . [a]cting . . . with one or more other persons, he . . . attempts to commit robbery" and, "in the course of and in furtherance of such crime or of immediate flight therefrom, he, or another participant . . . causes the death of a person other than one of the participants . . . ."  N.Y. Penal Law § 125.25(3).

[7] "A person is guilty of robbery in the first degree when he forcibly steals property and when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . [i]s armed with a deadly weapon."  N.Y. Penal Law § 160.15(2).  "A person is guilty of an attempt to commit a crime when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime."  Id. § 110.00.

6

Law §§ 110.00 and 160.10(1);[8] one count of criminal possession of a weapon in the second

degree in violation of New York Penal Law § 265.03(2);[9] one count of criminal possession of a

weapon in the third degree in violation of New York Penal Law § 265.02(4);[10] one count of

robbery in the first degree, for the robbery of Chinchilla, in violation of New York Penal Law §

160.15(4);[11] one count of robbery in the second degree, for the robbery of Chinchilla, in violation

of New York Penal Law § 160.10(1);[12] one count of attempted robbery in the first degree, for the

attempted robbery of Persichetti, in violation of New York Penal Law §§ 110.00 and 160.15(4);[13]

and one count of attempted robbery in the second degree, for the attempted robbery of

---

[8] "A person is guilty of robbery in the second degree when he forcibly steals property and when . . . [h]e is aided by another person actually present." N.Y. Penal Law § 160.10(1).  As noted above, "[a] person is guilty of an attempt . . . when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime." Id. § 110.00.

[9] "A person is guilty of criminal possession of a weapon in the second degree when, with intent to use the same unlawfully against another . . . [h]e possesses a loaded firearm." N.Y. Penal Law § 265.03(2), amended by 2005 N.Y. Sess. Laws ch. 764, § 3 (2005).

[10] "A person is guilty of criminal possession of a weapon in the third degree when . . . [s]uch person possesses any loaded firearm." N.Y. Penal Law § 265.02(4), repealed by 2006 N.Y. Sess. Laws ch. 742, § 1 (2006).

[11] "A person is guilty of robbery in the first degree when he forcibly steals property and when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . [d]isplays what appears to be a pistol . . . or other firearm . . . ." N.Y. Penal Law § 160.15(4).

[12] As noted above, "[a] person is guilty of robbery in the second degree when he forcibly steals property and when . . . [h]e is aided by another person actually present." N.Y. Penal Law § 160.10(1).

[13] As discussed above, "[a] person is guilty of robbery in the first degree when he forcibly steals property and when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . [d]isplays what appears to be a pistol . . . or other firearm," N.Y. Penal Law § 160.15(4), and "[a] person is guilty of an attempt . . . when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime," id. § 110.00.

Persichetti, in violation of New York Penal Law §§ 110.00 and 160.10(1).[14]  See Ciganek Aff.,

Ex. A.

## D.     The Pre-Trial Suppression Hearing

Prior to the commencement of his trial, Petitioner moved to suppress the statements that

he had made to the police and assistant district attorney on the grounds that they had been

obtained as the result of an unlawful arrest and had been given involuntarily.  See Ciganek Aff.,

Ex. B (omnibus motion) at 5–13 (unpaginated).  Petitioner argued that the police lacked probable

cause for his arrest, and he testified during the suppression hearing that followed that he did not

push Beltempo and that he had Christophe's permission to be in the apartment at 21 Gesner

Drive.  Petitioner further argued that his confessions were coerced and involuntary and testified

that he was detained prior to arraignment for approximately twenty-two hours; that he was not

given any food or drink during his detention until just before his arraignment; that he was

exhausted, confused and hungry at the time that he made these statements; that the police refused

his requests to speak with an attorney or his father; that he was intimidated by the police who, he

claimed, had assaulted him during the arrest; that he did not understand the Miranda warnings

that were given to him; that the police promised leniency if he confessed; and that he did not

realize that his confessions were being videotaped by the assistant district attorney.

In contrast, the prosecution argued that the SVPD officers had probable cause to arrest

Petitioner based on his apparently unauthorized presence at 21 Gesner Drive and on his having

---

[14] As noted above, "[a] person is guilty of robbery in the second degree when he forcibly steals property and when . . . [h]e is aided by another person actually present," N.Y. Penal Law § 160.10(1), and "[a] person is guilty of an attempt . . . when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime," id. § 110.00.

8

pushed Beltempo before fleeing into the apartment, and the SVPD officers provided testimony at the suppression hearing in support of this argument. <u>See</u> Ciganek Aff., Ex. C at 2–6 (unpaginated).  The prosecution also argued that Petitioner's confessions had been voluntary, and the SVPD officers testified at the hearing that they had not assaulted Petitioner during his arrest; that, although Petitioner was detained for approximately twenty-two hours, he actually was questioned for only a few of those hours, during which time he remained uncuffed, and that Petitioner spent the remaining time either alone in his cell, which had a toilet, or watching television in the grand jury room at the district attorney's office; that they provided Petitioner with food and drinks during his detention; that they repeatedly read Petitioner his <u>Miranda</u> warnings and obtained Petitioner's waiver of those rights; that they did not make any promises to Petitioner about potential leniency; that Petitioner never asked to speak with an attorney or family member; that Petitioner reviewed, corrected, and signed his written confessions; and that Petitioner confirmed that he understood that his subsequent statements to the assistant district attorney were being videotaped.

　　　As referenced above, the court held a five-day suppression hearing during which it heard the above-described testimony from Petitioner, several SVPD officers, and Christophe.  <u>See</u> Dkt. Nos. 31 (June 20, 2005 Hrg. Tr.; June 21, 2005 Hrg. Tr.; June 24, 2005 Hrg. Tr.), 29 (June 27, 2005 Hrg. Tr.; June 28, 2005 Hrg. Tr.).  In addition to hearing testimony from these witnesses, the court also considered the content of the statements that Petitioner made following his arrest, as well as the waiver forms that Petitioner signed while in custody.  Following the hearing, the trial court (1) decided to credit the testimony provided by the prosecution's witnesses and discredit Petitioner's testimony; (2) concluded that the SVPD officers had probable cause to

9

arrest Petitioner and had acted reasonably in effectuating his arrest; (3) determined that, even if Petitioner's arrest had been illegal, his subsequent confessions were sufficiently attenuated from the initial arrest; (4) found that Petitioner's confessions had been given voluntarily; and (5) denied Petitioner's motion to suppress the statements that he had made following his arrest. See Ciganek Aff., Ex. E (Decision & Order).

**E.    The Trial and Sentencing**

Petitioner's trial commenced on July 18, 2005.  Each of Petitioner's written confessions was read into the record.  See July 19, 2005 Trial Tr. at 69 (Petitioner's statement regarding attempted robbery at library); id. at 76–77 (Petitioner's statement regarding cab robbery); July 26, 2005 Trial Tr. at 505–07 (Petitioner's statement regarding attempted cab robbery and murder). In addition to Petitioner's confessions, the prosecution introduced the testimony of Leary, one of Petitioner's accomplices in the attempted robbery and murder of Pierre; Dyke, the friend at whose apartment Petitioner and his accomplices hid the pistol; Christophe, the tenant of the apartment at 21 Gesner Drive where Petitioner was arrested; Persichetti, the victim of the attempted robbery at the library; Chinchilla, the victim of the cab robbery; some other eyewitnesses; several SVPD officers who had worked on the investigation; and forensics medical and firearms examiners.  The police officers testified regarding the investigation that led to Petitioner's arrest and confessions, and this testimony included reference to Humeston's interview with Petitioner's sister.[15]  See July 25, 2005 Trial Tr. at 270–72.  While Petitioner

---

[15] During cross-examination of Petitioner, the trial court, over Petitioner's counsel's objection, also permitted the prosecution to ask Petitioner whether he had shown his sister a news article regarding the attempted robbery at the library and told her that he had committed that crime.  See Dkt. No. 33 (July 28, 2005 Trial Tr.) at 764–73.  Petitioner denied having made this statement to his sister.  Id. at 773.

testified in his own defense, denied any involvement in the crimes for which he was charged, and claimed that his confessions had been coerced, the jury returned a verdict of guilty on all charges on August 1, 2005.  Petitioner's trial counsel thereafter moved to dismiss all charges notwithstanding the jury's verdict on the ground that Petitioner had "not been proven guilty beyond a reasonable doubt from all the credible evidence" that had been submitted.  Dkt. No. 33 (Aug. 1, 2005 Trial Tr.) at 955.  The trial court denied this motion.  Id.

Petitioner was sentenced on November 15, 2005 to concurrent terms of (1) twenty-five years to life for the second-degree murder conviction, (2) twelve years plus five years of post-release supervision for one of the first-degree attempted robbery convictions, (3) eight years plus five years of post-release supervision for the other first-degree attempted robbery conviction, (4) seven years plus three years of post-release supervision for one of the second-degree attempted robbery convictions, (5) five years plus three years of post-release supervision for the other second-degree attempted robbery conviction, (6) twelve years plus five years of post-release supervision for the second-degree criminal possession of a weapon conviction, (7) five years plus three years of post-release supervision for the third-degree criminal possession of a weapon conviction, (8) fifteen years plus five years of post-release supervision for the first-degree robbery conviction, and (9) twelve years plus five years of post-release supervision for the second-degree robbery conviction.  The trial court also imposed a $270.00 penalty assessment for each conviction.

## F.   **The Direct Appeal**

Petitioner appealed his convictions to the New York State Appellate Division, Second Department, and raised the following claims:

(1)     the trial court erred by admitting Petitioner's involuntary confessions and thereby
        violated Petitioner's Fifth Amendment rights, see Pet'r's Appeal Br. at 9–13;

(2)     the trial court erred by admitting Petitioner's confessions because these
        confessions were the products of an arrest that lacked probable cause and thereby
        violated Petitioner's Fourth Amendment rights, see id. at 14–17;

(3)     the trial court erred by denying Petitioner's motion to dismiss at the conclusion of
        trial on the grounds that the prosecution had failed to prove Petitioner's guilt
        beyond a reasonable doubt, see id. at 18–22; and

(4)     the trial court imposed an excessive sentence, see id. at 23–26.

The prosecution opposed all of Petitioner's arguments on appeal.  See Resp't's Appeal

Br.

On April 7, 2009, the Second Department affirmed Petitioner's conviction.  See People v.

Latouche, 876 N.Y.S.2d 497 (App. Div. 2009).  With regard to Petitioner's challenge to "the

probable cause for his arrest," the Second Department found that "[a]ny illegality in the

defendant's arrest was sufficiently attenuated from his statements to law enforcement officials."

Id. at 497.  Regarding Petitioner's challenge to "the voluntariness of his statements to law

enforcement officials," the court concluded that "the hearing court properly determined that

[Petitioner's] statements, given after he was informed of, and waived, his Miranda rights were

voluntarily made."  Id. at 497–98 (internal citation omitted).  The Second Department agreed that

Petitioner had "failed to establish that in making his statements to the police, his 'will was

overborne and his capacity for self-determination critically impaired.'"  Id. at 498 (quoting

People v. White, 10 N.Y.3d 286, 292 (2008)).  Based on these determinations, the Second

Department held that the trial court had "properly denied" Petitioner's motion to "suppress his

statements to law enforcement officials."  Id.  The Second Department further held that

Petitioner's "contention that the evidence was legally insufficient to support his convictions is

without merit" because, "[v]iewing the evidence in the light most favorable to the prosecution,"

12

the evidence "was legally sufficient to establish [Petitioner's] guilt beyond a reasonable doubt"

and that the "verdict of guilt was not against the weight of the evidence." Id. (internal citation

omitted).  Finally, the Second Department found that the "sentence imposed was not excessive."

Id.

Petitioner sought leave from the New York Court of Appeals to appeal the Second

Department's decision on each of these claims.  See Ciganek Aff., Ex. I.  The Court of Appeals

denied Petitioner's request on July 27, 2009.  People v. Latouche, 12 N.Y.3d 926 (2009) (table

opinion).  Petitioner's conviction became final on October 26, 2009.[16]

## G.   The State Court Collateral Proceedings

After seeking a stay of the *habeas corpus* proceedings described below, on or about

August 9, 2010,[17] Petitioner, proceeding *pro se*, moved the trial court to vacate his judgment of

conviction pursuant to New York Criminal Procedure Law § 440.10[18] on the ground that

it was obtained in violation of his Sixth Amendment right to confront the witnesses against him.

See Ciganek Aff., Ex. K.  Petitioner argued in his motion that the prosecution made references

during his trial to the statement that his sister had made to an SVPD officer regarding Petitioner's

_____

[16] A judgment of conviction becomes final when the time to file a petition for a writ of
*certiorari* to the United States Supreme Court has expired, or ninety days after the New York
Court of Appeals denies leave to appeal.  See 28 U.S.C. § 2101(d); Sup. Ct. R. 13(1); Sup. Ct. R.
30(1); see also, e.g., Brown v. Greiner, 409 F.3d 523, 534 n.3 (2d Cir. 2005).  In this case, the
Court of Appeals denied Petitioner leave to appeal on July 27, 2009.  Ninety days thereafter fell
on Sunday, October 25, 2009.  The next business day was October 26, 2009.

[17] Petitioner's § 440.10 motion papers are undated but were notarized on July 13, 2010
and stamped received by the Rockland County District Attorney's Office on August 9, 2010.
See Ciganek Aff., Ex. K.

[18] "At any time after the entry of a judgment, the court in which it was entered may, upon
motion of the defendant, vacate such judgment . . . ."  N.Y. Crim. Proc. Law § 440.10(1).

having allegedly admitted to her that he was involved in the attempted robbery at the library.  See id.  The prosecution opposed Petitioner's motion, arguing that Petitioner's claim was procedurally barred under New York Criminal Procedure Law § 440.10(2)(c) given that the facts giving rise to this claim appeared on the trial record and Petitioner failed to raise the issue on direct appeal.[19]  The prosecution argued, alternatively, that Petitioner's claim was without merit given that the content of Petitioner's sister's out-of-court statement was not actually introduced at his trial.  See id., Ex. L.  The trial court denied Petitioner's motion on September 28, 2010, finding that Petitioner's claim was "procedurally barred" given that "[s]ufficient facts appear in the record to have raised the issue on direct appeal, but [Petitioner] unjustifiably failed to do so."  See id., Ex. M at 1 (unpaginated) (citing N.Y. Crim. Proc. Law § 440.10(2)(c)).  Petitioner sought leave to appeal the trial court's decision, see id., Ex. N, but the Second Department denied Petitioner's request on January 26, 2011.  See id., Ex. P.

## H.   **The _Habeas Corpus_ Proceedings**

On or about January 11, 2010,[20] Petitioner filed a petition seeking a writ of _habeas corpus_ accompanied by a supporting memorandum of law.  See Pet.; see also Dkt. No. 3 (Petitioner's Memorandum of Law).  As noted above, Petitioner's conviction became final on October 26, 2009, and Respondent does not dispute that the petition was timely filed within the applicable

---

[19] "[T]he court must deny a motion to vacate judgment when . . . sufficient facts appear[ed] on the record of the proceedings underlying the judgment to have permitted, upon appeal . . . , adequate review of the . . . issue raised upon the motion" but  "no such appellate review . . . occurred [because] . . . defendant[] . . . unjustifiabl[y] fail[ed] to raise such . . . issue upon . . . appeal . . . ."  N.Y. Crim. Proc. Law § 440.10(2)(c).

[20] The petition is dated January 11, 2010, was stamped received by the Southern District of New York _pro se_ office on January 25, 2010, and was docketed by the Clerk's Office on February 22, 2010.  See Dkt. No. 2.

one-year statute of limitations.  *See* 28 U.S.C. § 2244(d) (setting forth limitation period for *habeas* petitions); *see also* <u>Noble v. Kelly</u>, 246 F.3d 93, 97–98 (2d Cir. 2001) (holding that "prison mailbox rule" applies to *habeas* petitions such that petitions are deemed filed on the date that the petitioner "delivers the [petition] to prison officials" for mailing).

On July 9, 2010, at Petitioner's request, this Court entered a stay of the *habeas* proceedings to provide Petitioner with the opportunity to pursue the state court collateral motion discussed above.  *See* Dkt. Nos. 12, 13.  On February 14, 2011, this stay was lifted.  *See* Dkt. Nos. 17, 18.  As noted above, Petitioner submitted an amended memorandum of law in support of his *habeas* petition and asked the Court to disregard his previous memorandum of law.  *See* Dkt. No. 17; *see also* Pet'r's Mem.

Respondent's opposition papers were submitted in June and July of 2011.  *See* Ciganek Aff.; Resp't's Mem.  Petitioner's reply memorandum was received by the Court on November 10, 2011.  *See* Pet'r's Reply Mem.

A liberal reading of Petitioner's filings reveals that he raises the following claims in his petition for *habeas* review:[21]

    (1)    the trial court erred by admitting evidence referencing out-of-court statements that had been made by Petitioner's sister in violation of Petitioner's Sixth Amendment right to confront the witnesses against him, <u>see</u> Pet'r's Mem. at 22–24, Pet'r's Reply Mem. at 1–12;

    (2)    the trial court erred by admitting Petitioner's post-arrest statements given that these statements had been obtained as the result of Petitioner's unlawful arrest in violation of Petitioner's Fourth Amendment right against unreasonable search and seizure, <u>see</u> Pet'r's Mem. at 28–32, Pet'r's Reply Mem. at 13–15;

---

[21] <u>See</u> <u>Haines v. Kerner</u>, 404 U.S. 519, 520–21 (1972) (*per curiam*) (*pro se* allegations contained in *habeas corpus* petition should be liberally construed); <u>Graham v. Henderson</u>, 89 F.3d 75, 79 (2d Cir. 1996) (noting that "pleadings of a *pro se* plaintiff must be read liberally and should be interpreted to raise the strongest arguments that they suggest") (internal quotation marks omitted) (quoting <u>Burgos v. Hopkins</u>, 14 F.3d 787, 790 (2d Cir. 1994)).

(3)     the trial court erred by admitting Petitioner's post-arrest statements because these confessions were coerced and involuntary in violation of Petitioner's Fifth Amendment right against compelled self-incrimination, see Pet'r's Mem. at 33–40, Pet'r's Reply Mem. 16–25; and

(4)     the trial court erred by denying Petitioner's motion to dismiss at the conclusion of trial on the ground that the evidence was legally insufficient in violation of Petitioner's Fifth Amendment right to due process,[22] see Pet'r's Mem. at 41–45, Pet'r's Reply Mem. at 25–32.

## III. DISCUSSION

### A.     Applicable Law on *Habeas Corpus* Review

"Habeas review is an extraordinary remedy." Bousley v. United States, 523 U.S. 614, 621 (1998) (citing Reed v. Farley, 512 U.S. 339, 354 (1994)).  Before a federal district court may review the merits of a state criminal judgment in a *habeas corpus* action, the court must first determine whether the petitioner has complied with the procedural requirements set forth in 28 U.S.C. §§ 2244 and 2254.  If there has been procedural compliance with these statutes, the court must then determine the appropriate standard of review applicable to the petitioner's claims in accordance with § 2254(d).  The procedural and substantive standards applicable to *habeas* review, which were substantially modified by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1220 (Apr. 24, 1996), are summarized below.

### 1.     *Timeliness Requirement*

A federal *habeas corpus* petition is subject to AEDPA's strict, one-year statute of limitations.  See 28 U.S.C. § 2244(d).  The statute provides four different potential starting points for the limitations period and specifies that the latest of these shall apply.  See id. §

---

[22] Petitioner's reply memorandum confirms that Petitioner also raises a "related claim that the jury's verdict was against the weight of [the] evidence." See Pet'r's Reply Mem. at 25, 31–32.

16

2244(d)(1).  Under the statute, the limitations period is tolled only during the pendency of a

properly filed application for State post-conviction relief, or other collateral review, with respect

to the judgment to be challenged by the petition.  See id. § 2244(d)(2).  The statute reads as

follows:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of
> habeas corpus by a person in custody pursuant to the judgment of a State court.
> The limitation period shall run from the latest of –
>
>> (A) the date on which the judgment became final by the conclusion of
>> direct review or the expiration of the time for seeking such review;
>>
>> (B) the date on which the impediment to filing an application created by
>> State action in violation of the Constitution or laws of the United States is
>> removed, if the applicant was prevented from filing by such State action;
>>
>> (C) the date on which the constitutional right asserted was initially
>> recognized by the Supreme Court, if the right has been newly recognized
>> by the Supreme Court and made retroactively applicable to cases on
>> collateral review; or
>>
>> (D) the date on which the factual predicate of the claim or claims
>> presented could have been discovered through the exercise of due
>> diligence.
>
> (d)(2) The time during which a properly filed application for State post-
> conviction or other collateral review with respect to the pertinent judgment or
> claim is pending shall not be counted toward any period of limitation under this
> subsection.

Id. § 2244(d).

The one-year limitation period is subject to equitable tolling, which is warranted when a

petitioner has shown "'(1) that he has been pursuing his rights diligently, and (2) that some

extraordinary circumstance stood in his way' and prevented timely filing."  Holland v. Florida,

130 S. Ct. 2549, 2562 (2010) (quoting Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005)).  In the

Second Circuit, equitable tolling is confined to "rare and exceptional circumstance[s]," Smith v.

McGinnis, 208 F.3d 13, 17 (2d Cir. 2000) (per curiam) (internal quotation marks omitted), which have "prevented [the petitioner] from filing his petition on time," Valverde v. Stinson, 224 F.3d 129, 134 (2d Cir. 2000) (internal quotation marks and emphasis omitted).  The applicant for equitable tolling must "demonstrate a causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of his filing, a demonstration that cannot be made if the petitioner, acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances." Id.

  2.    *Exhaustion Requirement*

  A federal court may not grant *habeas* relief unless the petitioner has first exhausted his claims in state court.  O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999); see 28 U.S.C. § 2254(b)(1) ("[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that – (A) the applicant has exhausted the remedies available in the courts of the State; or (B)(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant"); id. § 2254(c) (the petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented").  The exhaustion requirement promotes interests in comity and federalism by demanding that state courts have the first opportunity to decide a petitioner's claim.  See Rose v. Lundy, 455 U.S. 509, 518–19 (1982).

  To exhaust a federal claim, the petitioner must have "fairly present[ed] his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim," and thus "giving the State the

18

opportunity to pass upon and correct alleged violations of its prisoners' federal rights." Baldwin

v. Reese, 541 U.S. 27, 29 (2004) (internal quotation marks omitted). "Because non-

constitutional claims are not cognizable in federal habeas corpus proceedings, a habeas petition

must put state courts on notice that they are to decide federal constitutional claims." Petrucelli v.

Coombe, 735 F.2d 684, 687 (2d Cir. 1984) (internal citation omitted) (citing Smith v. Phillips,

455 U.S. 209, 221 (1982)). Such notice requires that the petitioner "apprise the highest state

court of both the factual and legal premises of the federal claims ultimately asserted in the

habeas petition." Galdamez v. Keane, 394 F.3d 68, 73 (2d Cir. 2005). A claim may be "fairly

presented" to the state courts, therefore, even if the petitioner has not cited "chapter and verse of

the Constitution," in one of several ways:

> (a) [R]eliance on pertinent federal cases employing constitutional analysis, (b)
> reliance on state cases employing constitutional analysis in like fact situations, (c)
> assertion of the claim in terms so particular as to call to mind a specific right
> protected by the Constitution, and (d) allegation of a pattern of facts that is well
> within the mainstream of constitutional litigation.

Daye v. Attorney Gen. of State of N.Y., 696 F.2d 186, 194 (2d Cir. 1982). A *habeas* petitioner

who fails to meet a state's requirements to exhaust a claim will be barred from asserting that

claim in federal court. Edwards v. Carpenter, 529 U.S. 446, 451 (2000).

However, "[f]or exhaustion purposes, a federal habeas court need not require that a

federal claim be presented to a state court if it is clear that the state court would hold the claim

procedurally barred." Reyes v. Keane, 118 F.3d 136, 139 (2d Cir. 1997) (internal quotation

marks omitted). "In such a case, a petitioner no longer has remedies available in the courts of

the State within the meaning of 28 U.S.C. § 2254(b)." Grey v. Hoke, 933 F.2d 117, 120 (2d Cir.

1991) (internal quotation marks omitted). Such a procedurally barred claim may be deemed

exhausted by a federal *habeas* court. See, e.g., Reyes, 118 F.3d at 139. However, absent a

19

showing of either "cause for the procedural default and prejudice attributable thereto," <u>Harris v.</u> <u>Reed</u>, 489 U.S. 255, 262 (1989), or "actual innocence," <u>Schlup v. Delo</u>, 513 U.S. 298 (1995), the petitioner's claim will remain unreviewable by a federal court.

Finally, notwithstanding the procedure described above, a federal court may yet exercise its discretion to review and deny a mixed petition containing both exhausted and unexhausted claims, if those unexhausted claims are "plainly meritless." <u>Rhines v. Weber</u>, 544 U.S. 269, 277 (2005); <u>see</u> 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); <u>see also, e.g.</u>, <u>Padilla v. Keane</u>, 331 F. Supp. 2d 209, 216 (S.D.N.Y. 2004) (interests in judicial economy warrant the dismissal of meritless, unexhausted claims).

3.    *Procedural Default*

Even where an exhausted and timely *habeas* claim is raised, comity and federalism demand that a federal court abstain from its review when the last-reasoned state court opinion to address the claim relied upon "an adequate and independent finding of a procedural default" to deny it. <u>Harris</u>, 489 U.S. at 262; <u>see also</u> <u>Coleman v. Thompson</u>, 501 U.S. 722, 730 (1991); <u>Ylst</u> <u>v. Nunnemaker</u>, 501 U.S. 797, 803 (1991); <u>Levine v. Comm'r of Corr. Servs.</u>, 44 F.3d 121, 126 (2d Cir. 1995).

A state court decision will be "independent" when it "fairly appears" to rest primarily on state law. <u>Jimenez v. Walker</u>, 458 F.3d 130, 138 (2d Cir. 2006) (citing <u>Coleman</u>, 501 U.S. at 740). A decision will be "adequate" if it is "'firmly established and regularly followed' by the state in question." <u>Garcia v. Lewis</u>, 188 F.3d 71, 77 (2d Cir. 1999) (quoting <u>Ford v. Georgia</u>, 498 U.S. 411, 423–24 (1991)).

4.    *AEDPA Standard of Review*

Before a federal court can determine whether a petitioner is entitled to federal *habeas* relief, the court must determine the proper standard of review under AEDPA for each of the petitioner's claims. 28 U.S.C. § 2254(d)(1)–(2). This statute "modifie[d] the role of federal habeas courts in reviewing petitions filed by state prisoners," and imposed a more exacting standard of review. Williams v. Taylor, 529 U.S. 362, 402 (2000). For petitions filed after AEDPA became effective, federal courts must apply the following standard to cases in which the state court adjudicated on the merits of the claim:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

§ 2254(d)(1)–(2). The deferential AEDPA standard of review will be triggered when the state court has both adjudicated the federal claim "on the merits" and reduced its disposition to judgment. Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001). Where the state court "did not reach the merits" of the federal claim, however, "federal habeas review is not subject to the deferential standard that applies under AEDPA . . . . Instead, the claim is reviewed *de novo*." Cone v. Bell, 556 U.S. 449, 472 (2009); see § 2254(d).

Under the first prong of the AEDPA deferential standard, a state court decision is contrary to federal law only if it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if [it] decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. A decision

21

involves an "unreasonable application" of Supreme Court precedent if the state court "identifies the correct governing legal rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case," or if it "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407.

Under the second prong of AEDPA, the factual findings of state courts are presumed to be correct. 28 U.S.C. § 2254(e)(1); see Nelson v. Walker, 121 F.3d 828, 833 (2d Cir. 1997). The petitioner must rebut this presumption by "clear and convincing evidence." § 2254(e)(1).

**B.    Analysis of Petitioner's Claims**

1.    _Confrontation Clause Claim (Claim 1)_

Petitioner argues that references that were made during his trial to his sister's interview with an SVPD officer and to his allegedly having told his sister that he committed the attempted robbery at the library constituted testimonial out-of-court statements and violated his Sixth Amendment right to confront the witnesses against him. See Pet'r's Mem. at 22–24; Pet'r's Reply Mem. at 1–12. Respondent argues that this claim is procedurally barred from _habeas_ review because the state court decision rests on an adequate and independent state law ground and, alternatively, that this claim lacks merit because the content of Petitioner's sister's statements to the police was not introduced at Petitioner's trial. See Resp't's Mem. at 6–14.

Petitioner exhausted this claim in the state courts by requesting leave to appeal the trial court's decision denying the collateral motion in which he raised this claim. See Ciganek Aff., Ex. N. Because this request was denied, see id., Ex. P, the trial court's written decision on Petitioner's § 440.10 motion represents the last-reasoned state court decision to address Claim 1. See Ylst, 501 U.S. at 803. As discussed above, the trial court denied Petitioner's motion on the

22

ground that Petitioner's claim was "procedurally barred" because "[s]ufficient facts appear[ed] in the record" for Petitioner "to have raised the issue on direct appeal, but [Petitioner] unjustifiably failed to do so." See Ciganek Aff., Ex. M at 1; see also N.Y. Crim. Proc. Law § 440.10(2)(c) (providing that claims that are adequately based in the record but not argued on direct appeal must be denied when raised in post-conviction motion). Where a claim is sufficiently based in the record, a state court's reliance on § 440.10(2)(c) constitutes an adequate and independent state law ground that ordinarily precludes a federal court from further *habeas* review. See, e.g., Murden v. Artuz, 497 F.3d 178, 195–96 (2d Cir. 2007).

It is apparent to the Court that Claim 1 was sufficiently based in the trial record to have been raised on direct appeal. Accordingly, the trial court's reliance on § 440.10(2)(c) to deny Claim 1 establishes that the claim is procedurally defaulted. While Petitioner notes that this procedural default may be circumvented by a showing of cause and prejudice or a fundamental miscarriage of justice, see Pet'r's Reply Mem. at 3, Petitioner does not actually explain how either of these exceptions applies in this case, and the Court is unable to conclude on the basis of the record before it that Petitioner's procedural default of Claim 1 should be excused for either of these reasons.[23] See Sweet v. Bennett, 353 F.3d 135, 141 (2d Cir. 2003) (noting that, "where petitioner "does not argue cause and prejudice, nor do[es] [the court] see any basis in the record for such an argument," petitioner "could only avoid the consequences of his procedural default . . . if he could show that he is actually innocent"); Reese v. Alexander, 37 F. App'x 5, 8 (2d Cir. 2002) (noting that claim that "is . . . procedurally defaulted . . . may not be reviewed by this court

---

[23] While Petitioner also argues that his trial counsel preserved Claim 1 by contemporaneously objecting to the references made to these statements during Petitioner's trial, see Pet'r's Reply Mem. at 3–9, this preservation does not excuse Petitioner's failure to raise this claim on direct appeal.

23

absent a showing of cause for the default and prejudice, or a manifest miscarriage of justice").

Because of Petitioner's procedural default, I respectfully recommend that Claim 1 be denied.

2.  *Unlawful Arrest Claim (Claim 2)*

Petitioner argues that his arrest lacked probable cause in violation of his Fourth Amendment right against unreasonable search and seizure and that the trial court erred by denying his motion to suppress the evidence—specifically, the inculpatory statements that he made to the police and assistant district attorney—that was obtained as the result of this unlawful arrest.  See Pet'r's Mem. at 28–32; Pet'r's Reply Mem. at 13–15.  Respondent argues that this Fourth Amendment claim is not cognizable on *habeas* review pursuant to Stone v. Powell, 428 U.S. 465 (1976).[24]  See Resp't's Mem. at 14–17.

In Stone, the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  Stone, 428 U.S. at 482; see also, e.g., Graham v. Costello, 299 F.3d 129, 134 (2d Cir. 2002) (noting that, "once it is established that a petitioner has had an opportunity to litigate his or her Fourth Amendment claim . . . , the court's denial of the claim is a conclusive determination that the claim will never present a valid

---

[24] The Court finds—and Respondent does not dispute—that Petitioner exhausted this claim in the state courts.  See Pet'r's Appeal Br. at 14–17 (arguing that the trial court erred by admitting Petitioner's confessions because these confessions were the products of an arrest that lacked probable cause and thereby violated Petitioner's Fourth Amendment rights); Ciganek Aff., Ex. I (arguing in request for leave to appeal that "[t]he police lacked probable cause and/or reasonable suspicion to arrest [Petitioner], which gave rise to the tainted confession in this matter").

24

basis for federal habeas relief" and that "the bar to federal habeas review of Fourth Amendment claims is permanent and incurable absent a showing that the state failed to provide a full and fair opportunity to litigate the claim").  Indeed, courts in the Second Circuit, citing <u>Stone</u>, have routinely denied *habeas* petitions seeking review of Fourth Amendment suppression claims based on allegations that petitioners' confessions were obtained as the result of unlawful arrests because the *habeas* courts concluded that the petitioners had full and fair opportunities to litigate these claims in state court.  <u>See, e.g.</u>, <u>Jackson v. Scully</u>, 781 F.2d 291, 296–97 (2d Cir. 1986); <u>Pina v. Kuhlmann</u>, 239 F. Supp. 2d 285, 289 (E.D.N.Y. 2003); <u>Manning v. Strack</u>, No. CV 99-3874 (RR), 2002 WL 31780175, at *4–5 (E.D.N.Y. Oct. 11, 2002);[25] <u>Roberson v. McGinnis</u>, No. 99 Civ. 9751 (DAB)(AJP), 2000 WL 378029, at *2–6 (S.D.N.Y. Apr. 11, 2000) (Report and Recommendation); <u>France v. Artuz</u>, No. 98-CV-3850 (JG), 1999 WL 1251817, at *6 (E.D.N.Y. Dec. 17, 1999); <u>Quinones v. Keane</u>, No. 97 Civ. 3173 (KTD), 1998 WL 851583, at *4–5 (S.D.N.Y. Dec. 7, 1998).

Fourth Amendment claims may only be reviewed by a *habeas* court if one of two narrow exceptions applies: "(a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process."  <u>Capellan v. Riley</u>, 975 F.2d 67, 70 (2d Cir. 1992). Petitioner does not—nor could he—contend that New York failed to provide corrective procedures to redress his alleged Fourth Amendment claim.  Indeed, as the Second Circuit has noted, "the federal courts have approved New York's procedure for litigating Fourth

---

[25]  Copies of unreported cases cited herein will be mailed to Petitioner.  <u>See</u> <u>Lebron v. Sanders</u>, 557 F.3d 76 (2d Cir. 2009).

Amendment claims, embodied in N.Y. Crim. Proc. Law § 710.10 *et seq.*, as being facially

adequate." Id. at 70 n.1 (internal citation omitted) (quoting Holmes v. Scully, 706 F. Supp. 195,

201 (E.D.N.Y. 1989)) (internal quotation marks omitted).

Moreover, while Petitioner argues generally that his claim is not barred by Stone, see

Pet'r's Reply Mem. at 13, he does not suggest that any unconscionable breakdown of the state

process occurred.  "An unconscionable breakdown occurs when the state court fails to conduct a

reasoned inquiry into the petitioner's claim." Valtin v. Hollins, 248 F. Supp. 2d 311, 317

(S.D.N.Y. 2003).  In this case, Petitioner concedes that the trial court conducted a pre-trial

suppression hearing—after which it determined, based on the evidence presented at that hearing,

that Petitioner's arrest was lawful and that, even if the officers had lacked probable cause for the

arrest, Petitioner's confession was sufficiently attenuated from the arrest—and that the Appellate

Division affirmed the trial court's determinations on the merits.  While Petitioner argues that the

state court determination was incorrect, "mere dissatisfaction or disagreement with the outcome

of a suppression motion is not sufficient to establish that an 'unconscionable breakdown'

occurred in the existing process in violation of the petitioner's Fourth Amendment rights." Cook

v. Donnelly, No. 02-CV-6073 (VEB), 2009 WL 909637, at *5 (W.D.N.Y. Mar. 31, 2009) (citing

Capellan, 975 F.2d at 71).

Because Petitioner's Fourth Amendment claim is not cognizable on federal *habeas*

review, I respectfully recommend that Claim 2 be denied.

       3.       *Involuntary Confession Claim (Claim 3)*

Petitioner argues that the trial court erred by denying his motion to suppress the

inculpatory statements that he claims were obtained from him involuntarily in violation of his

Fifth Amendment right against compelled self-incrimination.[26]  See Pet'r's Mem. at 33–40;

Pet'r's Reply Mem. at 16–25.  Respondent argues that the state court determination that

Petitioner's confessions were voluntary, and therefore admissible, was neither contrary to, nor

reflected an unreasonable application of, clearly established federal law.[27]  See Resp't's Mem. at

---

[26] On reply, Petitioner also argues that his confessions should have been suppressed because he allegedly invoked his right to remain silent at the outset of the police interview by denying any involvement in or knowledge of the crimes and by telling the police that he did not wish to speak with them.  See Pet'r's Reply Mem. at 18–24.  Petitioner, however, did not raise this record-based argument before the state courts.  See Pet'r's Appeal Br. at 9–13, Ciganek Aff., Ex. I (Pet'r's Request for Leave to Appeal).  Accordingly, this claim may be deemed exhausted and procedurally defaulted because Petitioner may not now raise it in state court through collateral motion, and Petitioner has not alleged cause and prejudice or a fundamental miscarriage of justice to circumvent this procedural default.  See N.Y. Crim. Proc. Law § 440.10(2)(c); Reese, 37 F. App'x at 8.  The Court, therefore, need not consider this argument. Even if Petitioner had exhausted this argument, however, the Court notes that the potential merit of the claim is questionable given that the trial court made a determination of fact, as discussed in additional detail below, that Petitioner did not inform the police that he wished to remain silent.  See Ciganek Aff., Ex. E at 7, 17; see also Bruno v. Cunningham, No. 03 Civ. 937 (MBM), 2004 WL 2290503, at *6–7 (S.D.N.Y. Oct. 8, 2004) (noting that "invocation of the right to remain silent" requires that suspect "unequivocally and unambiguously state his desire not to be subject to further questioning" and that, "[a]bsent an assertion by a suspect of his right to remain silent, the police are free to continue questioning a suspect who has validly waived his Miranda rights at an earlier time without re-advising him of those rights"); Holland v. Donnelly, 216 F. Supp. 2d 227, 239 (S.D.N.Y. 2002) (noting that right to remain silent was not invoked where petitioner "had been properly advised of his rights and agreed to answer questions, and thereafter neither remained entirely silent nor stated that he wished to be asked no further questions but instead simply answered some questions and did not respond to others") (quoting United States v. Ramirez, 79 F.3d 298, 305 (2d Cir. 1996)) (internal quotation marks omitted), aff'd, 324 F.3d 99 (2d Cir. 2003).

[27] The Court concludes—and Respondent does not dispute—that Petitioner fairly presented this claim to the state courts.  See Pet'r's Appeal Br. at 9–13 (arguing that the trial court erred by admitting Petitioner's involuntary confessions and thereby violated Petitioner's Fifth Amendment rights); Ciganek Aff., Ex. I (arguing in request for leave to appeal that "the Appellate Division erred in affirming the County Court's Miranda ruling" because Petitioner "was questioned in a highly hostile manner and environment" and "was forced to sign a confession").  The Appellate Division found that Petitioner had "failed to establish that in making his statements to the police, his 'will was overborne and his capacity for self-determination critically impaired'" and therefore affirmed the trial court's decision to deny Petitioner's motion to suppress  Latouche, 876 N.Y.S.2d  at 498 (quoting White, 10 N.Y.3d at

17–20.  Because Petitioner fully exhausted Claim 3, and because the Appellate Division ruled on the merits of this claim, this Court will assess the merits of Claim 3 using the deferential AEDPA standard of review.  See 28 U.S.C. § 2254(d)(1)–(2).

It is well-established that due process prohibits the use of a coerced, involuntary confession—evidence which is "inherently untrustworthy"—to secure a defendant's conviction. Dickerson v. United States, 530 U.S. 428, 433 (2000).  The test employed to determine "whether a defendant's will was overborne" examines the totality of the circumstances surrounding his confession.  Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); accord Dickerson, 430 U.S. at 434.  Those circumstances include "'both the characteristics of the accused and the details of the interrogation.'"  Dickerson, 430 U.S. at 434 (quoting Schneckloth, 412 U.S. at 226).[28]

"Without exception, the [Supreme] Court's confession cases hold that the ultimate issue

_____

292).

[28] In Green v. Scully, 850 F.2d 894 (2d Cir. 1988), the Second Circuit held:

In applying the totality of the circumstances test, those factors that a court should consider to determine whether an accused's confession is voluntary center around three sets of circumstances:  (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials.  The relevant characteristics of the individual who confessed are the individual's experience and background, together with the suspect's youth and lack of education or intelligence. The second circumstance, the conditions under which a suspect is questioned, includes the place where the interrogation is held, and the length of detention.  The presence or absence of counsel is a significant condition . . . .  The final and most critical circumstance . . . is the law enforcement officers' conduct.  Facts bearing on that conduct include the repeated and prolonged nature of the questioning or the failure to inform the accused of his constitutional rights; whether there was physical mistreatment such as beatings; or long restraint in handcuffs, and whether other physical deprivations occurred such as depriving an accused of food, water or sleep; or even of clothing for a prolonged period.  In addition . . . such police conduct might include psychologically coercive techniques such as brainwashing or promises of leniency or other benefits.

Id. at 901–02 (internal citations omitted).

of 'voluntariness' is a legal question requiring independent federal determination." Miller v.

Fenton, 474 U.S. 104, 110 (1985).  Even so, "subsidiary factual questions, such as . . . whether in

fact the police engaged in the intimidation tactics alleged by the [petitioner], are entitled to the

§ 2254(d) presumption," and "the federal habeas court, should, of course, give great weight to the

considered conclusions of a coequal state judiciary." Id. at 112 (internal citation omitted); see

also id. at 117 (noting that "state-court findings" on issues such as "the length and circumstances

of the interrogation, the defendant's prior experience with the legal process, and familiarity with

the *Miranda* warnings, often require the resolution of conflicting testimony of police and

defendant" and "therefore . . . are conclusive on the habeas court if fairly supported in the record

and if the other circumstances enumerated in § 2254(d) are inapplicable"); Nelson, 121 F.3d at

833 (noting that factual determinations made by a state court—"that is, recitals of external events

and the credibility of the witnesses narrating them"—are entitled to a presumption of correctness

but that this presumption is "set aside" if the petitioner rebuts it by clear and convincing

evidence or demonstrates that "the material facts were not adequately developed at the State

court hearing," or if the reviewing court "finds that the factual determination is not fairly

supported by the record") (quoting Green, 850 F.2d at 900; Pagan v. Keane, 984 F.2d 61, 64 (2d

Cir. 1993)) (internal quotation marks omitted).  "[O]nce such underlying factual issues have been

resolved," the federal *habeas* court "determin[es] whether, under the totality of the

circumstances, the confession was obtained in a manner consistent with the Constitution."

Miller, 474 U.S. at 117.

     During Petitioner's pre-trial suppression hearing, Petitioner testified that, at the time of

his arrest, five or six officers "rushed" at him inside Christophe's apartment at 21 Gesner Drive

and that "[t]hey jumped on top of [him] and started punching" and "kick[ing]" him.  See June

29

27, 2005 Hrg. Tr. at 318–19.  Petitioner claimed that, upon his arrival at the SVPD station, he

had a "bloody lip and a runny nose with blood" and was "dizzy and exhausted," but did not

request medical treatment because he "kn[e]w they wouldn't give it to [him]."  Id. at 322.

According to Petitioner, he received no food or drink during the time that he was detained until

he received breakfast in the morning before his arraignment, that he never received medical

treatment for the injuries he allegedly sustained during the arrest, and that he continued to feel

"dizzy" and "exhausted."  Id. at 332, 336, 338, 341–43.  Petitioner also testified that, while he

was waiting in his jail cell and each time that he was questioned, he "told all the police officers"

that he wanted to call his father and his lawyer and that he did not want to speak with the police,

but the officers "refused" and continued to question him.  Id. at 330–31, 333–35, 381–82.

Petitioner claimed that he eventually confessed to the crimes because the police officers "left

[him] no choice" because they "kept on asking [him] many questions."  Id. at 335–36.  Petitioner

stated that he answered the assistant district attorney's questions on videotape in an effort to "be

left alone" and because he felt that he had "no choice" since the officers had refused to allow

him to call his lawyer or his father.  Id. at 340.  Petitioner further testified that Bookstein did not

read the Miranda warnings or have Petitioner sign the waiver form until after Petitioner had

given his statement to the police.  Id. at 376–80, 382.  Petitioner claimed that he had not

understood the questions that the assistant district attorney asked him on videotape about

whether he had been treated fairly by the police, whether he had been read and had waived his

Miranda rights prior to giving his statements to the police, and whether he was giving his

statements voluntarily.  See id. at 380, 384–85.

In contrast, Beltempo, the arresting officer, testified that he and one other officer entered

the apartment at 21 Gesner Drive in order to arrest Petitioner and that Petitioner engaged in

physical violence against the officers in an attempt to resist the arrest.  <u>See</u> June 20, 2005 Hrg.

Tr. at 63–66 (unpaginated).  Christophe, who had given the police permission to enter her

residence at 21 Gesner Drive, testified that only two police officers had entered her home to

arrest Petitioner and that Petitioner had "struggle[d]" with the officers during the arrest because

he "didn't want to go."  <u>See</u> June 28, 2005 Hrg. Tr. at 403–05.  Humeston,  Bookstein, and

Kummert, the interviewing officers, testified that Petitioner was informed of, and waived, his

<u>Miranda</u> rights several times, including before any police interviews began; that Petitioner

received food and drink during the time that he was being interviewed, in addition to the

breakfast he received the following morning; and that Petitioner had an opportunity to watch

television, uncuffed, while waiting to be interviewed by the assistant district attorney.  <u>See</u> June

21, 2005 Hrg. Tr. at 143–47, 190–94, 207–09, 212–13, 220–21, 223, 225–26 (partially

unpaginated); June 24, 2005 Hrg. Tr. at 255–59, 270–73 (unpaginated).  The officers denied

engaging in any coercive tactics and also denied that Petitioner ever requested to speak with his

lawyer or a family member.  <u>See</u> June 21, 2005 Hrg. Tr. at 154–55, 158, 205, 210–11, 233–34;

June 24, 2005 Hrg. Tr. at 268–70 .  While the police witnesses conceded that Petitioner was in

custody from the early afternoon of January 25 until his arraignment late the following morning,

they testified that Petitioner was only questioned for a total of approximately four to five hours

during that time.  <u>See</u> June 21, 2005 Hrg. Tr. at 188, 218–26 (establishing that Petitioner was

questioned between the hours of, approximately, 7:45 p.m. and 10:45 p.m. and again between the

hours of, approximately, 12:45 a.m. and 2 a.m.).  During the suppression hearing, the

prosecution also introduced Petitioner's post-arrest photograph, <u>Miranda</u> waiver forms, signed

written confessions, and videotaped confessions as evidence.

    After considering this evidence, the trial court concluded that Petitioner's testimony was

"unreliable and unworthy of belief," given that his "testimony regarding his arrest was directly contradicted by the testimony of an independent eyewitness, Ms. Christophe" and that his "self-serving testimonial account" of his confinement was "contradicted not only by the police witnesses, but by the physical exhibits and [Petitioner's] own recorded statements." Ciganek Aff., Ex. E at 7–8. Accordingly, the trial court discredited Petitioner's testimony and credited the version of events presented by the prosecution's witnesses. See id. at 1–9. These factual determinations are entitled to a presumption of correctness, and Petitioner has failed to rebut this presumption by clear and convincing evidence.

In light of these factual circumstances, the trial court found that Petitioner's "statements, under the totality of the circumstances, was [sic] not involuntarily made." Id. at 17; see also id. at 16–17 (concluding that Petitioner was "adequately apprised of his Miranda rights prior to making the statements," that he "knowingly and voluntarily waived his rights," and that there was no credible evidence in the record that Petitioner had "asked for an attorney or invoked his right to silence prior or during any of the statements"). The trial court considered the appropriate factors in determining that Petitioner's "will was [not] overborne" and that his "statements were voluntarily given." Id. at 18–21 (considering duration of Petitioner's detention and interrogation, whether there was any unnecessary delay in arraigning Petitioner, whether Petitioner was deprived of sleep or food, whether Petitioner received Miranda warnings prior to questioning, and whether the police had engaged in threatening or otherwise coercive behavior). It is apparent that the Second Department affirmed the trial court's decision using the same standard. See Latouche, 876 N.Y.S.2d at 497–98.

Presuming that the factual determinations made by the trial court are correct, the Court

32

concludes that the state court determination that Petitioner's confessions were given voluntarily is neither contrary to, nor constitutes an unreasonable application of, clearly established federal law.  See Harris v. Woods, No. 05 Civ. 5582 (PAC)(AJP), 2006 WL 1140888, at *30–33 (S.D.N.Y. May 1, 2006) (concluding that confessions were voluntary where there was "no credible evidence that the detectives were hostile or abusive or that [petitioner] asked for the interrogation to stop or requested an attorney, and all evidence indicates that [he] was talking voluntarily to the officers" and, "thus, the police conduct was not coercive," and where petitioner spent six hours at police station prior to making first statement and was allowed to sleep or rest during that time) (Report and Recommendation), adopted by 2006 WL 1975990 (S.D.N.Y. July 10, 2006); Wilson v. Walker, No. 00-CV-5348 (FB), 2001 WL 1388299, at *3–4 (E.D.N.Y. Nov. 2, 2001) (concluding that post-Miranda confession was voluntary where "length of . . . interrogation was substantial" but "other circumstances of the interrogation were not so coercive that he was disabled from . . . making a knowing and voluntary waiver of his rights," given that petitioner "was never told that he could not leave," his requests not to speak to certain officers or give written statements were honored, he "was allowed to go to the bathroom unattended and was given food and drink," the "questioning by the detectives was not overly aggressive and did not employ trickery or deceit," "[t]here [was] nothing about [petitioner's] individual characteristics that made him particularly vulnerable to police interrogation," and "there is no indication that he did not understand his rights once he was given the warnings or that his waiver was not knowing and voluntary"); Richter v. Artuz, 77 F. Supp. 2d 385, 395–96 (S.D.N.Y. 1999) (concluding that "petitioner's confession was obtained in a manner compatible with the requirements of the Constitution" where petitioner, "while present at the police barracks for a considerable amount of time, was questioned only intermittently and not continuously," "was

offered . . . food and drink," "did not express his desire to leave," and did not "verbalize a request to speak with an attorney"); Coronado v. Lefevre, 748 F. Supp. 131, 137–39 (S.D.N.Y. 1990) (presuming state court's "subsidiary factual findings"—including that "petitioner's interrogation lasted for approximately nine hours, [but] was not continuous," that police "fed petitioner, let him use the bathroom, and allowed him to watch television for an extended period of time," and that petitioner was "'responsive'" and apparently "answered the questions freely"—"to be correct" and concluding, following an "independent legal review[,] that no coercion or duress occurred, and that petitioner voluntarily waived his *Miranda* rights prior to interrogation").

Accordingly, I respectfully recommend that Claim 3 be denied on the merits.

4.    *Legally Insufficient Evidence Claim (Claim 4)*

Petitioner argues that the prosecution failed "to prove his guilt beyond a reasonable doubt at trial" and that the "trial court erred in denying his motion to dismiss all charges" on this basis. Pet'r's Mem. at 41; see also id. at 41–45; Pet'r's Reply Mem. at 25–32.  Specifically, Petitioner argues that the evidence was legally insufficient insofar as (1) neither of the living victims of the crimes, nor any other eyewitnesses who testified at Petitioner's trial, were able to identify Petitioner as the perpetrator of the crimes but only offered general descriptions of the appearance of the assailants, including that their faces were covered; (2) there was no physical evidence introduced at Petitioner's trial that placed Petitioner at the scene of the crimes; (3) the testimony provided by Leary, one of Petitioner's accomplices, regarding Petitioner's having allegedly grabbed the murder victim around the neck was undermined by the medical examiner's testimony that there was no bruising on the victim's neck; and (4) the testimony provided by Dyke, the friend at whose apartment Petitioner and his accomplices hid the gun used during the

crimes, was contradictory and not credible.  See Pet'r's Mem. at 42–44; Pet'r's Reply Mem. at

28–30; see also Pet'r's Appeal Br. at 18–22.  In opposition, Respondent argues that the Appellate

Division applied the appropriate federal constitutional standard to Petitioner's claim and that its

application of this standard to the facts of Petitioner's case was not unreasonable, given that

Petitioner "confessed to the crimes he committed numerous times . . . and gave a detailed

synopsis of his part in each of the three attacks" and given that Petitioner's confessions were

corroborated by the "vivid" testimony of Petitioner's accomplice in the attempted cab robbery

and murder, the testimony of the surviving robbery and attempted robbery victims, the testimony

of Petitioner's friend at whose apartment Petitioner and his accomplices hid the gun, and the

testimony of the prosecution's ballistics and medical experts.  Resp't's Mem. at 25–27.  Because

Petitioner fully exhausted Claim 4 in the state courts,[29] and because the Appellate Division

---

[29] The Court finds—and Respondent does not dispute—that Petitioner fairly presented
this claim to the state courts by arguing that the prosecution failed to prove his guilt beyond a
reasonable doubt.  See Pet'r's Appeal Br. at 18–22 (arguing that "the People failed to prove
[Petitioner's] guilt beyond a reasonable doubt at trial and the trial court erred in denying his
motion to dismiss all charges" and that "the People failed to sustain their burden by introducing
legally sufficient evidence to support all counts of the indictment"); Ciganek Aff., Ex. I (arguing
in request for leave to appeal that "the Court erred in denying [Petitioner's] motion to dismiss at
the conclusion of the trial" and that "[t]he weight of the evidence was insufficient to warrant
proof beyond a reasonable doubt").  By asserting this claim in terms that are "so particular as to
call to mind a specific [constitutional] right," and because claims for legally insufficient evidence
are "well within the mainstream of constitutional litigation," Daye, 696 F.2d at 194, Petitioner
exhausted this claim in the state courts.  See Cruz v. Smith, No. 05 Civ. 6070 (SCR)(GAY),
2008 WL 5770788, at *4 (S.D.N.Y. Jan. 15, 2008) (noting that petitioner's "refer[ence] to a
failure by the prosecution to prove the essential elements of a crime 'beyond a reasonable doubt'
with regards to his conviction . . . . qualifies as an 'assertion of the claim in terms so particular as
to call to mind a specific right protected by the constitution'" and also alleges a pattern of facts
that is "'well within the mainstream of constitutional litigation'") (quoting Daye, 696 F.2d at
194) (Report and Recommendation), adopted by 2009 WL 816749 (S.D.N.Y. Mar. 25, 2009);
Leake v. Senkowski, No. 01 Civ. 7559 (SHS)(GWG), 2004 WL 1464889, at *21 (S.D.N.Y. June
30, 2004) (holding that, "by arguing in the state courts that the evidence was insufficient to
support his murder conviction," petitioner had "adequately presented to the state courts a federal

decided this claim on the merits,[30] the Court will consider the merits of this claim using the deferential AEDPA standard of review.  See 28 U.S.C. § 2254(d)(1)–(2).

"[T]he Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." Jackson v. Virginia, 443 U.S. 307, 315 (1979) (internal quotation marks omitted).  However, on *habeas* review, a claim of legally insufficient evidence will not succeed where, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319 (emphasis in original).  A *habeas* petitioner therefore "bears a very heavy burden" to show that no rational jury could have found the substantive elements of the offense beyond a reasonable doubt and succeed on such a claim. Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 811 (2d Cir. 2000) (internal quotation marks omitted).  "When it considers the sufficiency of the evidence of a state conviction, [a] federal court must look to state law to determine the elements of the crime." Id. (quoting Quartartaro v. Hanslmaier, 186 F.3d 91, 97 (2d Cir. 1999)) (internal quotation marks omitted).

The elements of each of the crimes for which Petitioner was convicted—murder in the second degree, attempted robbery in the first degree, attempted robbery in the second degree, robbery in the first degree, robbery in the second degree, criminal possession of a weapon in the

──────────────

due process challenge to the sufficiency of the evidence") (Report and Recommendation).

[30] The Appellate Division concluded that Petitioner's "contention that the evidence was legally insufficient to support his convictions is without merit" because, "[v]iewing the evidence in the light most favorable to the prosecution," the evidence "was legally sufficient to establish [Petitioner's] guilt beyond a reasonable doubt" and that the "verdict of guilt was not against the weight of the evidence." Latouche, 876 N.Y.S.2d at 498.

second degree, and criminal possession of a weapon in the third degree—are set forth above, see

supra notes 6–14, and therefore will not be repeated here.   Bearing those elements in mind, the

Court agrees with Respondent that Petitioner admitted the essential elements of these crimes in

the confessions that he gave to the police, which were read into the record at his trial.   In his

statement regarding the attempted robbery at the Finkelstein Library, Petitioner made the

following admissions:

> That I believe on last Tuesday 01-18-05 at approximately 09:30 to 10:00 a.m. I
> was at the Finkelstein Library with a friend of mine named Brandon [Dixon].  We
> were in the parking lot waiting for someone to come so that we could rob them.  I
> was wearing a black flight jacket, black ski mask and blue jeans.  Brandon was
> wearing a dark colored flight jacket and blue jeans and he wore a white bandana
> across his face.  A white female pulled into the parking lot with a black Toyota
> Camry.  I believe the woman was wearing a red dress.  Brandon approached the
> woman and pulled out a .22-caliber pistol and pointed it to the ground.  The
> woman didn't want to give him any money.  I took the gun from Brandon and
> pointed the gun to the ground.  I said . . . , "get your purse out of the car" . . . .
> The woman didn't want to give me anything so we left.  We ran to the rear of the
> Mini-Mart and then we were in the front of the stores.

July 19, 2005 Trial Tr. at 69 (internal quotation marks omitted).   In his confession regarding the

cab robbery, Petitioner stated:

> That I believe on last Tuesday, 1-18-05,[31] at about 10 to 10:30 a.m. I was at the
> International Food Mart with a friend of mine named Brandon [Dixon].  We were
> in the parking lot.  I was wearing a black flight jacket, black ski mask and blue
> jeans.  Brandon was wearing a dark colored flight jacket and blue jeans and he
> wore a white bandana across his face.  A green and white or orange and white taxi
> pulled up with a Mexican male driver.  I got in the rear seat behind the driver's
> seat and Brandon got into the front seat.  I said that . . . "we wanted to go to Union
> Road" . . . .  When we got to Union Road I pointed an apartment complex out to
> the driver and said, . . . "take me to the back" . . . .  I had a silver .22 caliber pistol
> in my pocket and pulled it out and stuck it in the driver's face when he pulled up
> to the back.  I said . . . , "give me your wallet" . . . .  The driver took out his wallet

---

[31] Petitioner apparently changed the date from January 19 to January 18 before signing
the statement, though, by all other accounts, this incident, as well as the attempted robbery at the
library, took place on January 19.  See id. at 75.

37

and I removed the money which contained a receipt.  The driver asked for the
receipt back and I gave it to him.  Brandon turned the car off, took the keys,
ripped out the two-way radio and threw it outside and stole a Nextel i90 phone.
We left the taxi and walked to Union Road and went to the Gesner Apartments.
We counted the money which came out to $140.00.  I took $70.00 and Brandon
took $70.00.  I don't know what Brandon did with the car keys and I think
Brandon threw the phone away because the screen didn't work.

Id. at 76–77 (internal quotation marks omitted).  Finally, in his statement regarding the attempted

cab robbery and murder, Petitioner admitted:

That on Thursday, about a week ago I went to Vlad's house at Gesner Drive.  I
met Brandon [Dixon] there and Daquan [Leary], and Daquan slept there.  Brandon
got . . . . my gun from the closet in Vlad's room.  I knew he had it because we
were going to do business. . . .  I had the gun a couple of weeks.  I bought the gun
for a hundred dollars from a guy I know as Red.  Red is from Gesner Drive.  The
gun came with a box of bullets which I kept in a closet at Vlad's room.  The gun
was a silver gun missing the magazine.  It was a .22-caliber.  Brandon, Daquan
and I walked over to the shopping center by Butcher Boys.  We saw a cab, and I
went up to the driver.  The driver said he would not take us.  I then went up to a
second cab and we all got in the cab.  We all sat in the back seat.  Brandon who
had the gun was behind the driver.  I was in the middle and Daquan was in the
rear passenger seat.  We told the driver to take us to Castle Fairview area.  The
driver took us to the apartments on Funston Avenue, I think it was called Royal
Castle.  The driver drove us there by Main Street to Funston Avenue, down
Funston, turning into the apartments and driving to the back.  Brandon and I got
out of the driver's side of the cab, Daquan got out of the driver's side of the cab.  I
was taking money out to pay the cab driver.  I was going to give him a large bill so
that he would have to take his money out to make change.  Brandon pulled the
gun and told the driver to give him the money.  The driver started to fight with
Brandon.  Brandon was pointing the gun at the driver through the window of the
cab.  Brandon fired the gun and the driver yelled.  The driver was sitting in the
driver's seat of the cab.  We started running away and Daquan yelled at Brandon,
"why did you do that"?  Brandon did not say anything.  We all ran to 20 Fairview
Avenue and went into the hallway to hide.  We also went there because our friend
Daron Dyke lives there on the third floor left apartment.  I'm sorry for what
happened.  I did not want to kill anyone.  The gun was just to scare the driver.

July 26, 2005 Trial Tr. at 505–07.  Moreover, in addition to Petitioner's own statements, the trial

court also admitted corroborating evidence, including the testimony of Persichetti, the victim of

the attempted robbery at the library, see Dkt. No. 28 (July 18, 2005 Trial Tr.) at 63–89;

38

Chinchilla, the victim of the cab robbery, see id. at 90–109; Leary, one of Petitioner's accomplices, see July 26, 2005 Trial Tr. at 408–49; Dyke, the friend at whose apartment Petitioner and his accomplices hid Petitioner's gun, see July 19, 2005 Trial Tr. at 155–92; the police officers who investigated the crimes, see July 19, 2005 Trial Tr. at 25–86, 108–22; July 25, 2005 Trial Tr. at 258–99, 324–48; July 26, 2005 Trial Tr. at 369–97, 472–529, 570–81; a forensics medical examiner, see July 28, 2005 Trial Tr. at 647–79, 704–06; and a forensics firearms examiner, see July 26, 2005 Trial Tr. at 598–629.[32]

It is apparent to the Court that, considering the content of Petitioner's confessions, as well as the other evidence admitted at Petitioner's trial, and drawing all reasonable inferences in favor of the prosecution, a reasonable jury easily could have concluded that Petitioner was guilty of the crimes for which he was convicted. This Court, therefore, is unable to conclude that the decision of the state court was contrary to, or involved an unreasonable application of, clearly established federal law. See Stewart v. Hunt, No. 9:09-CV-712 (MAD/TWD), 2012 WL 4107825, at *8–11 (N.D.N.Y. Sept. 19, 2012) (finding that, "[t]aking the evidence and testimony presented at trial in the light most favorable to the prosecution, it is clear that a rational trier of fact could conclude that Petitioner engaged in the conduct underlying his conviction," given that victim's "testimony and Petitioner's sworn admission clearly establish each of the required elements of the crime" for

---

[32] Under New York law, "[a] person may not be convicted of any offense solely upon evidence of a confession or admission made by him without additional proof that the offense charged has been committed." N.Y. Crim. Proc. Law § 60.50. While Petitioner has raised no specific argument with regard to this state law requirement, the Court notes that, to the extent that Petitioner suggests that "sufficient corroboration of the contents of his inculpatory statement[s] was required, but [is] lacking in this case," such a claim "ignores the fact that such an omission implicates a matter of state law, though not necessarily one of a constitutional dimension." Yates v. Rivera, No. 9:03-CV-1057 (LEK/DEP), 2007 WL 2027284, at *6 (N.D.N.Y. July 9, 2007). Nonetheless, Petitioner's confessions were "amply corroborated" by other evidence. Id.

which petitioner was convicted and therefore denying petitioner's legally insufficient evidence claim); Scott v. Fisher, 652 F. Supp. 2d 380, 426–28 (W.D.N.Y. 2009) (finding that petitioner's "written confession, and [police investigators'] testimony about his oral statements to them, if believed by the jury, were more than sufficient to show [petitioner] possessed the requisite mental culpability" and, "[t]hus, the evidence to support [petitioner's] conviction for felony murder, as accomplice, was not constitutionally lacking"); Yates, 2007 WL 2027284, at *5–7 (concluding that, "[b]ased upon the evidence adduced at trial, including petitioner's own confession and the medical evidence revealing [victim's injuries], . . . petitioner has not demonstrated that [Appellate Division's] decision rejecting [petitioner's] insufficiency claim is either contrary to, or represents an unreasonable application of, *Jackson* and its progeny").

To the extent that Petitioner claims that certain testimony was not credible or otherwise challenges the weight of the evidence presented at his trial, such claims are not cognizable on *habeas* review.  See Taylor v. Curry, 708 F.2d 886, 892 (2d Cir. 1983) (noting that, on *habeas* review, court is "not free to second-guess . . . credibility judgments"); Peterson v. Greene, Nos. 06 Civ. 41 (GEL), 06 Civ. 811 (GEL), 2008 WL 2464273, at *6 (S.D.N.Y. June 18, 2008) ("[Q]uestions of credibility are quintessentially matters for the jury, and do not raise constitutional issues of sufficiency for resolution by a habeas court."); Garrett v. Perlman, 438 F. Supp. 2d 467, 470 (S.D.N.Y. 2006) ("Unlike a sufficiency of the evidence claim, which is based upon federal due process principles, a weight of the evidence claim is 'an error of state law, for which habeas review is not available.'") (quoting Douglas v. Portuondo, 232 F. Supp. 2d 106, 116 (S.D.N.Y. 2002)); Leake, 2004 WL 1464889, at *22 (noting that "'assessments of the weight of the evidence or the credibility of witnesses are for the jury' and thus a habeas court must

'defer to the jury's assessments of both of these issues'") (quoting Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996)); Hayes v. Coombe, No. 96 Civ. 865 (LLS), 1996 WL 650728, at *2 (S.D.N.Y. Nov. 7, 1996) ("[T]he assessment of the credibility of a trial witness is entrusted to the factfinder.").

Accordingly, I respectfully recommend that Claim 4 be denied on the merits.

## IV.  <u>CONCLUSION</u>

For the reasons set forth above, I conclude—and respectfully recommend that Your Honor should conclude—that the Petition should be **DENIED**.  Further, because reasonable jurists would not find it debatable that Petitioner has failed to demonstrate by a substantial showing that he was denied a constitutional right, I recommend that no certificate of appealability be issued.  See 28 U.S.C. § 2253(c); Slack v. McDaniel, 529 U.S. 473, 483–84 (2000).

Dated: March 8, 2013
  White Plains, New York

      Respectfully submitted,

      _____
      Paul E. Davison
      United States Magistrate Judge

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days, plus an additional three (3) days, or a total of seventeen (17) days, from service of this Report and Recommendation to serve and file written objections.  See also Fed. R. Civ. P. 6(a), (b), (d).  Such objections, if any, along with any responses to the objections, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of the Honorable Vincent Briccetti, at the Honorable Charles L. Brieant, Jr. Federal Building and United States Courthouse, 300 Quarropas Street, White Plains, New York 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Briccetti.

A copy of the foregoing Report and Recommendation has been mailed to:

Valery LaTouche, *pro se*
DIN 05-A-5812
Sing Sing Correctional Facility
354 Hunter Street
Ossining, NY 10562